**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

|  |  |
|---|---|
| GENERAL MICRO SYSTEMS, INC., a California corporation,<br><br>    Plaintiff,<br><br>v.<br><br>EVERCORE GROUP L.L.C., a Delaware limited liability company; IRA WOLFSON, an individual; and DOES 1-25,<br><br>    Defendants. | Civil Action No.  1:25-CV-09157-KPF |

---

## AMENDED COMPLAINT

---

Plaintiff General Micro Systems, Inc. ("GMS"), for its Amended Complaint against Defendants Evercore Group L.L.C. ("Evercore"), Ira Wolfson ("Wolfson"), and DOES 1-25 (together, "Defendants"), alleges as follows:

## INTRODUCTION

1.    This case arises from Defendants' breach of their professional obligations as GMS's financial advisor. Pursuant to the parties' Engagement Agreement, Defendants were tasked with assisting GMS in the sale of the company. Rather than conducting an open and competitive sale process to maximize value for GMS, Defendants engaged in a pattern of willful misconduct designed to steer GMS's potential sale to a preferred buyer, suppressing competition and harming GMS's interests.

2.     When GMS discovered this willful misconduct and terminated Evercore for cause, Defendants responded by demanding inflated fees and threatening to enforce a "tail provision" that would prevent GMS from pursuing value-maximizing transactions with buyers that Defendants had improperly discouraged. GMS seeks damages for Defendants' willful misconduct, bad faith, and breaches and declaratory relief invalidating the tail provision to allow GMS to pursue its best interests free from Defendants' continuing interference.

## <u>PARTIES</u>

3.     Plaintiff General Micro Systems, Inc. is a California corporation with its principal place of business in Rancho Cucamonga, California. GMS is a manufacturer of computing engines and embedded computers.

4.     Defendant Evercore Group L.L.C. is a Delaware limited liability company with a principal place of business located at 55 East 52nd Street, New York, New York 10055. Evercore is a national investment banking firm that provides financial advisory services, including for companies located in California like GMS.

5.     Defendant Ira Wolfson is an individual and the Senior Managing Director of Evercore, where he provides financial advisory services for companies located in California.

6.     GMS is unaware of the true names or capacities, whether individual, corporate, associate, or otherwise, of Defendant DOES 1 through 25, inclusive. GMS therefore sues said defendants by such fictitious names. GMS will amend this Amended Complaint to show their true names or capacities when the same have been ascertained.  GMS is informed and believes, and based thereon alleges, that DOES 1-25 are responsible in some manner for the occurrences alleged herein, and that the damages alleged herein were proximately caused by such defendants.

Defendants Evercore, Wolfson, and DOES 1-25 are collectively referred to herein as "Defendants".

## JURISDICTION AND VENUE

7.     This Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1332 in that there is complete diversity of citizenship and the amount in controversy exceeds, exclusive of interest and costs, the sum of $75,000.

8.     This Court has personal jurisdiction over Defendants.

9.     Venue is proper in this Court pursuant to the Court's October 31, 2025 Order (Dkt. No. 25).

## COMMON FACTUAL ALLEGATIONS

**A.     The Engagement Agreement.**

10.     GMS is a specialized manufacturer of high-performance computing engines and embedded computer systems, serving critical markets including aerospace, defense, and industrial sectors.

11.     On or about 2019, several years prior to engaging Evercore as its advisor in the sale of the company, GMS was contacted by several parties interested in acquiring GMS. One of those potential buyers was Veritas Capital ("Veritas").

12.     As a result of Veritas's interest in acquiring GMS, its CEO, Benjamin Sharfi, was introduced to and subsequently formed a business relationship with Hugh Evans, the Managing Partner at Veritas.

13.     On or about late 2022, GMS began interviewing business brokers to help bring GMS to market and to find a potential buyer for GMS.

14.     Mr. Evans strongly recommended Ira Wolfson, the Senior Managing Director at Evercore, to act as an advisor for GMS' intended sale.

15.     While Mr. Sharfi was aware that Mr. Evans and Wolfson had previously conducted a business transaction together, what was not disclosed to him was how close their personal relationship had become as a result of that transaction, nor the mutual incentive it created for them to continue working together to their shared benefit.

16.     More specifically, Wolfson, by and through Evercore, acted as the financial advisor to Abaco Systems, Inc., a company owned and controlled by Veritas, in connection with its sale to Ametek, Inc. It is believed that such transaction was valued in excess of one billion dollars.  GMS is informed and believes, and based thereon alleges, that this highly successful transaction forged a close personal bond between Wolfson and Mr. Evans.

17.     GMS is informed and believes, and based thereon alleges, that Evercore and Wolfson profited significantly from such transaction. This lucrative collaboration gave both Wolfson and Mr. Evans a strong financial incentive to continue working together, including by manipulating the GMS sales process to favor Veritas.

18.     GMS is informed and believes, and based thereon alleges, that other members of Wolfson's Evercore team also had preexisting personal relationships with Veritas.

19.     As a direct result of Mr. Evans' personal recommendation, GMS engaged Evercore as its exclusive financial advisor to assist GMS in a strategic sale of the company pursuant to an

engagement letter dated December 6, 2022 (the "Engagement Agreement"), with the understanding that Wolfson would be serving as the lead negotiator and face of the transaction.

20.     Under the Engagement Agreement, Evercore agreed to provide "financial advisory services as customarily may be provided by Evercore in connection with engagements of this type."

21.     During the course of the relationship, Evercore provided comprehensive financial advisory services including identifying and screening potential buyers, coordinating due diligence, evaluating proposals, and structuring and negotiating financial aspects of any transaction.

22.     In exchange for these services, Evercore would receive expense reimbursements and a substantial success fee if a transaction was completed, with fees ranging from 1.0% to 7.0% of transaction value depending on the size of the deal.

23.     The Engagement Agreement included a nine-month "tail period" following termination (the "Tail Provision"), during which GMS would owe Evercore the full success fee if GMS completed a transaction with any party that Evercore had contacted during the engagement period.

24.     The Engagement Agreement created a fiduciary relationship between Evercore and GMS, requiring Evercore to act in GMS's best interests and to exercise the highest degree of care, loyalty, and skill in performing its duties.

25.     As part of the engagement process, and at Evercore's direction, GMS spent considerable time and resources engaging with third party vendors to prepare, among other things,

audited financial statements to demonstrate profitability for potential buyers, all of which was required by Evercore before commencing the sale process.

**A.    Evercore commences negotiations for the sale of GMS.**

26.    Evercore's team, led and overseen primarily by advisors other than Wolfson, prepared an initial three-page "teaser" letter and sales book for the planned transaction. The vast majority of the work was performed by junior advisors with minimal experience in the aerospace, defense and industrial industry.

27.    The teaser letter was allegedly distributed to 98 potential buyers through Evercore's claimed extensive network of contacts, resulting in 50 parties executing nondisclosure agreements to receive additional financial information (the "CIP") from GMS.

28.    Of the 50 parties that received the CIP,  11 submitted an initial non-binding offer ("IOI"). The IOIs ranged anywhere from $530 million to $700 million.

29.    Based upon representations made by Evercore's team, 11 parties was allegedly an exceedingly positive response showing a great deal of interest in GMS.

30.    To that end, on or about January 15, 2025, Veritas submitted an initial bid letter stating that Veritas "is prepared to acquire [GMS] on a cash-free, debt-free basis for an aggregate valuation of $650 million to $700 million".

31.    On or about February 2025, GMS conducted management presentations for nine of the original 11 interested parties. Veritas's management presentation was conducted on February 4, 2025. Notably, Wolfson did not participate in, nor attend any of the management presentations.

32.     In the following months, after GMS had conducted its management presentations and provided the various bidders, including Veritas, with extensive due diligence (both financial and legal), bidders slowly started to indicate a lack of interest to move forward. By April 2025, only two of the original 11 bidders were left, one of which was Veritas.

33.     Despite its requests, GMS was never informed with any particularity as to why the other nine bidders were no longer interested in acquiring GMS. The only information GMS received consisted of two to four brief bullet points in a slide deck, which failed to provide any meaningful explanation for the bidders' decisions to withdraw. Evercore did not explain what steps, if any, it had taken to address the bidders' concerns, nor did it provide any strategy for how such concerns could be addressed. Instead, Evercore continued focusing its efforts on Veritas.

34.     To that end, while GMS had limited direct contact with bidders through meetings at GMS's offices and dinners, GMS had no direct communication with any of the bidders regarding the specific terms of their bids or the negotiation process. Any and all substantive communication regarding the potential deal and/or transfer of information concerning deal terms with almost all of the respective bidders passed exclusively through Evercore.

35.     GMS is informed and believes, and based thereon alleges, that Evercore made certain misrepresentations or statements which discouraged parties other than Veritas from moving forward in the process.

36.     During the due diligence process, Veritas provided no less than two "check in" bids, each indicating a willingness to purchase GMS for an amount in excess of $600 million.

37.     By May 2025, Veritas was the only remaining bidder.

38.    On May 14, 2025, Veritas, knowing full well that all of the other competition had been eliminated by and through Evercore's actions, took full advantage and severely undercut its last check in bid by submitting a final proposal to acquire GMS in exchange for $350 million.

**A.    Defendants' misconduct.**

39.    Rather than conduct an open and competitive sale process to maximize value for GMS, Evercore engaged in a pattern of bad faith and misrepresentations designed to eliminate other bidders and steer the transaction to Veritas.

40.    GMS is informed and believes, and based thereon alleges, that Evercore actively discouraged competitive bidders by making unauthorized pricing representations. Specifically, Evercore told one company, "Company A",[1] that they were "not even in the ballpark" and not to bother continuing unless they were willing to offer $700 million, despite GMS never authorizing such statements.

41.    GMS is informed and believes, and based thereon alleges, that Evercore's unauthorized representations and bad faith sales tactics resulted in the artificial elimination of competition and thereafter the basis for Veritas's dramatic price reduction.

42.    When GMS inquired on numerous occasions regarding bidders dropping out, Evercore failed to provide any substantive explanations.

43.    GMS is informed and believes, and based thereon alleges, that Wolfson maintained a business and personal relationship with Hugh Evans of Veritas that predated the Engagement Agreement. GMS is also informed and believes, and based thereon alleges, that during the process,

---

[1] Company name withheld for confidentiality reasons in this public filing.

Wolfson communicated regularly with Evans via email and personal cell phone and that the two actively discussed the means and methods upon which Evercore could help eliminate competition from the bidding process on behalf of Veritas.

44.    GMS is informed and believes, and based thereon alleges, that Evercore had undisclosed financial relationships, business connections, personal relationships, and/or other conflicts of interest with Veritas that incentivized Evercore to favor Veritas over other potential buyers.

45.    Beyond disclosing the prior Abaco transaction that GMS was already aware of, Evercore failed to disclose the actual conflicts of interest arising from Wolfson's close personal relationship with Mr. Evans and the financial incentives they shared to continue collaborating, in violation of Evercore's fiduciary duties and the terms of the Engagement Agreement.

46.    GMS is informed and believes, and based thereon alleges, that throughout the engagement, Evercore systematically excluded, discouraged, or undermined potential buyers other than Veritas by: (a) Failing to contact qualified strategic buyers who would likely pay premium valuations; (b) Providing incomplete or misleading information to potential buyers; (c) Discouraging interested parties from submitting bids; and (d) Steering negotiations to favor Veritas's position.

47.    GMS is informed and believes, and based thereon alleges, that Evercore withheld material information from GMS about the level of interest and potential valuations from alternative buyers, preventing GMS from making informed decisions about the sale process.

48.    Evercore's conduct had the intended effect of suppressing competition and driving down the potential sale price for GMS, benefiting Veritas at GMS's expense.

49.    Upon discovering Evercore's misconduct, GMS immediately confronted Evercore about its actions. On June 27, 2025, GMS terminated Evercore for cause due to its breaches of its professional standard of care and fiduciary duty, conflicts of interest, and failure to act in GMS's best interests.

### A.    Evercore's response and continued misconduct.

50.    Rather than acknowledge their misconduct, Defendants responded with a letter dated July 3, 2025, denying any wrongdoing and demanding payment of unqualified expenses totaling $259,185.23.

51.    Defendants also threatened to enforce the Tail Provision of the Engagement Agreement, claiming entitlement to success fees if GMS completes any transaction with parties contacted during the engagement period.

52.    Defendants' enforcement of the Tail Provision under these circumstances constitutes bad faith and is unconscionable, as they seek to benefit from their own misconduct by preventing GMS from pursuing transactions with buyers that Defendants improperly discouraged.

53.    The invoice submitted by Evercore includes numerous questionable charges and appears to be artificially inflated as retaliation for GMS' termination of the engagement.

54.    As a direct and proximate result of Defendants' misconduct, GMS has suffered substantial damages including: (a) Lost opportunity to complete a higher-value transaction with alternative buyers; (b) Diminished negotiating position with remaining potential buyers; (c) Delay

in completing a strategic transaction; (d) Wasted time and resources; (e) Damage to business relationships and reputation; (f) The ongoing threat of the Tail Provision preventing completion of value-maximizing transactions; and (g) Monetary damages for unnecessary financial due diligence expenses.

55.     GMS's damages are continuing and will increase if Defendants are permitted to enforce the Tail Provision against transactions with buyers that Defendants improperly discouraged.

**FIRST CAUSE OF ACTION**
**(Breach of Fiduciary Duty Against All Defendants)**

56.     GMS incorporates by reference all preceding allegations as if fully set forth herein.

57.     By entering into the Engagement Agreement and accepting the role of exclusive financial advisor for GMS's potential sale, Defendants assumed fiduciary duties to GMS as a matter of law.

58.     Evercore and Wolfson were under a duty to act for and give advice for the benefit of GMS upon matters within the scope of their relationship.

59.     Additionally, Evercore and Wolfson induced GMS to place confidence in Evercore and Wolfson's knowledge and expertise to advise GMS with respect to the sale of GMS.

60.     GMS placed trust and confidence in Evercore and Wolfson to provide professional advice with respect to the prospective sale, including identifying and screening potential buyers, coordinating due diligence, evaluating proposals, and structuring and negotiating financial aspects of any transaction.

61.     In connection with the advisory relationship, GMS entrusted Evercore and Wolfson with sensitive and proprietary information concerning GMS's business operations and placed special trust and confidence in Evercore and Wolfson to act in GMS's best interest in using GMS's business information to broker the proposed sale of the company.

62.     GMS entrusted Evercore and Wolfson and placed Evercore and Wolfson in a position of special trust and confidence with respect to dealing with third-party prospective purchasers. As set forth herein, all substantive communications with respective bidders passed exclusively through Evercore and Wolfson.

63.     Financial advisors, such as Evercore and Wolfson, owe their clients fiduciary duties, including absolute loyalty, utmost good faith, and the exercise of reasonable care and skill in performing their advisory services.

64.     Specifically, Defendants owed GMS the duties of loyalty, care, disclosure, confidentiality, and fair dealing.

65.     Defendants materially breached their fiduciary duties to GMS in numerous ways, including but not limited to:

(a)     **Breach of Duty of Loyalty**: Placing their own financial interests and those of Veritas Capital above GMS's interests by steering the sale process to favor Veritas rather than conducting an open competitive process designed to maximize value for GMS;

(b)     **Breach of Duty of Disclosure**: Failing to disclose material conflicts of interest with Veritas, including any financial relationships, business connections, or other arrangements that created incentives for Defendants to favor Veritas;

(c)     **Breach of Duty of Care**: Failing to exercise reasonable care and skill by

systematically excluding qualified potential buyers, providing inadequate market coverage, failing to competently oversee junior financial advisors, and failing to properly manage the sale process;

(d)    **Self-Dealing**: Using confidential information about GMS and the sale process to benefit Veritas and advance Defendants' own interests rather than GMS's interests;

(e)    **Misrepresentation and Concealment**: Affirmatively misrepresenting the level of interest from alternative buyers and concealing material information about potential valuations and buyer interest;

(f)    **Sabotaging Competitive Process**: Actively discouraging legitimate potential buyers from participating in the process, thereby reducing competition and suppressing GMS's potential sale price.

66.    Defendants' breaches of fiduciary duty were willful and intentional, or alternatively, constituted gross negligence in the performance of their duties to GMS.

67.    At all relevant times, GMS reasonably relied on Defendants to fulfill their fiduciary duties and act in GMS's best interests in conducting the sale process.

68.    Defendants' breaches of fiduciary duty directly and proximately caused substantial harm to GMS, including lost opportunity to achieve a higher sale price, diminished negotiating position, damage to relationships with potential buyers, and ongoing interference with GMS's ability to complete value-maximizing transactions.

69.    As a direct and proximate result of Defendants' breaches of fiduciary duty, GMS has suffered substantial damages in an amount to be proven at trial, but believed to exceed several million dollars.

## SECOND CAUSE OF ACTION
### (Breach of Contract Against Defendant Evercore Group L.L.C.)

70.    GMS incorporates by reference all preceding allegations as if fully set forth herein.

71.    The Engagement Agreement constitutes a valid and binding contract between GMS and Evercore.

72.    Under the Engagement Agreement, Evercore agreed to provide competent financial advisory services in connection with the sale of GMS.

73.    Evercore materially breached the Engagement Agreement by failing to conduct a proper sale process designed to maximize value for GMS.

74.    GMS performed all of its obligations under the Engagement Agreement until its termination for cause.

75.    As a direct and proximate result of Evercore's material breaches, GMS has suffered substantial damages in an amount to be proven at trial.

## THIRD CAUSE OF ACTION
### (Breach of the Covenant of Good Faith and Fair Dealing

### Against Defendant Evercore Group L.L.C.)

76.    GMS incorporates by reference all preceding allegations as if fully set forth herein.

77.    GMS and Evercore were parties to the Engagement Agreement, which created contractual obligations between the parties.

78.    GMS performed all of its material obligations under the Engagement Agreement.

79.    The Engagement Agreement contains an implied covenant of good faith and fair dealing, under which neither party could take any action that would unfairly interfere with the right of the other party to receive the benefits of the Engagement Agreement.

80.    Evercore breached the implied covenant of good faith and fair dealing by: (a) Acting in bad faith to benefit itself and Veritas at GMS's expense; (b) Deliberately undermining the sale process to suppress competition and reduce GMS's potential transaction value; (c) Concealing material information and conflicts of interest; (d) Seeking to enforce the Tail Provision after engaging in misconduct that damaged GMS' position with alternative buyers.

81.    Additionally, Evercore breached the implied covenant of good faith and fair dealing by staffing GMS's transaction primarily with advisors inexperienced in the aerospace, defense and industrial sectors. While two more senior advisors were assigned to the deal, Wolfson, who GMS understood would be the main advisor overseeing the transaction and whose involvement was a key reason GMS entered into the Engagement Agreement, provided less actual oversight or involvement than had been represented to GMS initially.

82.    Indeed, much of Wolfson's "involvement" on the transaction involved him responding to emails from his phone and directing junior advisors to do key negotiation work that GMS hired him to do.

83.    Evercore's conduct frustrated the fundamental purpose of the Engagement Agreement, which was to maximize value for GMS through a competitive sale process.

84.     As a direct and proximate result of Evercore's breaches of the covenant of good faith and fair dealing, GMS has been damaged in an amount to be determined at trial, including lost business opportunities, diminished market position, and other consequential damages.

### FOURTH CAUSE OF ACTION
**(Professional Negligence Against All Defendants)**

85.     GMS incorporates by reference all preceding allegations as if fully set forth herein.

86.     As an investment banking firm providing financial advisory services and the Senior Managing Director of said investment banking firm, Defendants owed GMS a professional duty of care to perform their services according to the standard of care applicable to investment bankers in similar circumstances.

87.     Defendants breached this professional duty by: (a) Failing to conduct a proper competitive sale process; (b) Allowing conflicts of interest to compromise their professional judgment; (c) Providing advice and services that were not in GMS's best interests; (d) Failing to properly identify, contact, and manage relationships with potential buyers; (e) Acting below the standard of care that a reasonable investment bank and advisor would exercise; (f) Failing to adequately manage advisors with little aerospace, defense and industrial sector experience during the due diligence and negotiations process.

88.     No reasonable investment banking firm or financial advisor in Defendants' position would have acted in the manner described herein.

89.     As a direct and proximate result of Defendants' professional negligence, GMS has been damaged in an amount to be determined at trial, including lost business opportunities, diminished market position, and other consequential damages.

**FIFTH CAUSE OF ACTION**
**(Intentional Interference with Prospective Economic**
**Advantage Against All Defendants)**

90.    GMS incorporates by reference all preceding allegations as if fully set forth herein.

91.    GMS had prospective economic relationships with various potential buyers who expressed interest in acquiring GMS.

92.    Defendants knew of these prospective economic relationships and deliberately interfered with them by discouraging potential buyers, providing misleading information, and steering the process away from competitive bidding.

93.    Defendants' interference was wrongful and fraudulent and was not justified by any legitimate business purpose, but rather was motivated by Evercore's desire to benefit itself and Veritas.

94.    Defendants' conduct was a substantial factor in causing disruption of GMS's prospective economic relationships with alternative buyers.

95.    As a direct and proximate result of Defendants' intentional interference, GMS has been damaged in an amount to be determined at trial, including lost business opportunities, diminished market position, and other consequential damages.

**SIXTH CAUSE OF ACTION**
**(Common Law Unfair Competition Against All Defendants)**

96.    GMS incorporates by reference all preceding allegations as if fully set forth herein.

97.     Defendants engaged in unfair competition by, *inter alia,* using their position of trust and access to GMS's confidential information to harm GMS's interests for Defendants' own benefit and the benefit of Veritas.

98.     For example, upon information and belief, Defendants deliberately and in bad faith interfered with the sale discouraging potential buyers, and Defendant Wolfson communicated regularly with Evans of Veritas to discuss eliminating competition from the bidding process on behalf of Veritas, resulting in the elimination of competing bids and the substantial reduction of Veritas' bid.

99.     Defendants acted in bad faith and with intent to deceive GMS, as evidenced by their (a) material misrepresentations and omissions regarding conflicts of interest and the sale process; (b) Concealment of material facts about potential buyers' interest levels and proposed valuations; (c) Misrepresentation of their efforts and intentions in conducting the sale process; and (d) intent to deceive GMS about the true nature of the market interest in GMS.

100.    Defendants' conduct has caused and will continue to cause injury in fact and lost money or property to GMS, including but not limited to lost opportunity for higher-value transactions, diminished business value, and ongoing interference with business relationships.

101.    GMS seeks restitution of all money and benefits wrongfully obtained by Defendants as a result of its unfair competition, including the return of fees and expenses paid and disgorgement of any benefits received from third parties in connection with the misconduct alleged herein.

## SEVENTH CAUSE OF ACTION
### (Violation of California Unfair Competition Law - Business and Professions Code Section 17200 et seq. Against All Defendants)

102.    GMS incorporates by reference all preceding allegations as if fully set forth herein.

103.    California's Unfair Competition Law ("UCL"), Business and Professions Code Section 17200 et seq., prohibits "unfair," "unlawful," and "fraudulent" business acts or practices and unfair, deceptive, untrue or misleading advertising.

104.    Defendants engaged in unlawful business practices in violation of the UCL by: (a) Breaching its fiduciary duties to GMS as alleged herein; (b) Breaching the Engagement Agreement as alleged herein; (c) Violating professional standards and ethical rules applicable to investment banking services; (d) Engaging in conduct that violates fundamental public policies regarding fiduciary relationships and professional service obligations.

105.    Defendants engaged in unfair business practices in violation of the UCL by: (a) Acting in bad faith and breach of their fiduciary duties while serving as GMS's exclusive financial advisor; (b) Placing their own interests and those of third parties above their client's interests; (c) Engaging in conduct that offends public policy and is immoral, unethical, oppressive, and substantially injurious to GMS; (d) Using its position of trust and access to confidential information to harm GMS's interests for Defendants' own benefit.

106.    Defendants engaged in fraudulent business practices in violation of the UCL by: (a) Making material misrepresentations and omissions regarding conflicts of interest and the sale process; (b) Concealing material facts about potential buyers' interest levels and proposed valuations; (c) Misrepresenting their efforts and intentions in conducting the sale process; (d) Acting with intent to deceive GMS about the true nature of the market interest in GMS.

107.    Defendants' violations of the UCL have caused and continue to cause injury in fact and lost money or property to GMS, including but not limited to lost opportunity for higher-value transactions, diminished business value, and ongoing interference with business relationships.

108.    GMS seeks restitution of all money and benefits wrongfully obtained by Defendants as a result of their UCL violations, including the return of fees and expenses paid and disgorgement of any benefits received from third parties in connection with the misconduct alleged herein.

109.    GMS also seeks injunctive relief to prevent future violations of the UCL, including an order prohibiting Evercore from enforcing the Tail Provision of the Engagement Agreement and from interfering with GMS's business relationships.

## SEVENTH CAUSE OF ACTION
### (Negligent Misrepresentation Against Defendant Ira Wolfson)

110.    GMS incorporates by reference all preceding allegations as if fully set forth herein.

111.    As a financial advisor, Defendant Woldson possesses unique, specialized knowledge.

112.    As a result of his specialized knowledge and relationship with GMS, Wolfson had a duty to give true and correct information to GMS.

113.    In or about December 2022, Wolfson communicated to Mr. Sharfi, GMS's CEO, that if GMS engaged Evercore to be its advisor in connection with the planned sale of GMS, Wolfson would be the primary negotiator in the sales process, would be involved in all aspects of the sales process, and would endeavor to obtain the most profitable result for GMS.

114.    The aforementioned representations were not true.

115.    Wolfson had no reasonable grounds for believing his representations to be true.

116.    Wolfson intended that GMS rely on these representations in order to induce GMS to enter into the Engagement Agreement.

117.    In reasonable reliance on Wolfson's representations, GMS entered into the Engagement Agreement and subjected itself to the Tail Provision.

118.    GMS could not have learned the true facts through reasonable diligence, and as a result, its reliance upon Wolfson's misrepresentations was justified and reasonable.

119.    As a direct and proximate result of Wolfson's misrepresentations, GMS has been damaged in an amount to be determined at trial, including lost business opportunities, diminished market position, and other consequential damages.

## NINTH CAUSE OF ACTION
### (Declaratory Judgment Against All Defendants)

120.    GMS incorporates by reference all preceding allegations as if fully set forth herein.

121.    An actual controversy exists between GMS and Defendants regarding the enforceability of the Tail Provision in the Engagement Agreement.

122.    Defendants contend that the Tail Provision entitles it to success fees if GMS completes transactions with any parties contacted during the engagement period.

123.     GMS contends that Evercore's material breaches of the Engagement Agreement, and Defendants' collective breaches of fiduciary duty and acts of bad faith, render the Tail Provision unenforceable as a matter of law and equity.

124.     Alternatively, GMS contends that enforcement of the Tail Provision under these circumstances would be unconscionable and contrary to public policy.

125.     GMS seeks a judicial declaration that the Tail Provision is unenforceable and that GMS may pursue transactions with any and all potential buyers without obligation to pay success fees to Evercore.

126.     A judicial declaration is necessary and appropriate to resolve this controversy and provide guidance for GMS's future business decisions.

## DEMAND FOR TRIAL BY JURY

127.     GMS respectfully requests a trial by jury on all issues so triable.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff General Micro Systems, Inc. prays for relief as follows:

1.      For compensatory damages in an amount according to proof at trial;

2.      For an order awarding restitution of all amounts obtained by Defendants by means of their wrongful acts described herein;

3.      For pre-judgment interest at the legal rate for all amounts owed;

4.      For a judicial declaration pursuant to the Uniform Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202 that: (a) The Tail Provision in the Engagement Agreement is unenforceable due to Evercore's material breaches and Defendants' collective misconduct; (b) GMS has no obligation to pay success fees to Evercore for any future transactions; and (d) GMS

has no further obligations to Evercore under the Engagement Agreement;

5.      For an order prohibiting Evercore from enforcing the Tail Provision of the Engagement Agreement and from interfering with GMS's business relationships;

6.      For costs of suit incurred herein; and

7.      For such other and further relief as the Court deems just and proper, including attorneys' fees.


**ARCHER & GREINER, P.C.**
*Attorneys for Plaintiff*


BY: */s/ Rafael A. Llano*
RAFAEL A. LLANO, ESQ.
MICHAEL J. LAURICELLA, ESQ.
1211 Avenue of the Americas - Suite 2750
New York, New York 10036
Phone: (212) 682-4940
*rllano@archerlaw.com*
*mlauricella@archerlaw.com*

MATTHEW D. HINKS (CA Bar No. 200750)
JULIA CONSOLI-TIENSVOLD (CA Bar No. 324142)
*mhinks@jmbm.com*
*jctiensvold@jmbm.com*
1900 Avenue of the Stars, 7th Floor
Los Angeles, California 90067-4308
*Attorneys for Plaintiff*
(*Pro Hac Vice Admission To Be Filed*)

DATED: December 3, 2025

231383287 v2