# IN THE UNITED STATES DISTRICT COURT
# FOR THE SOUTHERN DISTRICT OF NEW YORK

GENERAL MICRO SYSTEMS, INC., a California corporation,

        Plaintiff,

        v.

EVERCORE GROUP L.L.C., a Delaware limited liability company; IRA WOLFSON, an individual; and DOES 1-25,

        Defendants.

Civil Action No. 1:25-cv-09157-KPF

Hon. Katherin P. Failla

---

## PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION TO DISMISS THE SECOND AMENDED COMPLAINT

---

MATTHEW D. HINKS (PHV)
JULIA CONSOLI-TIENSVOLD (PHV)
JEFFER MANGELS & MITCHELL LLP
1900 Avenue of the Stars, 7th Floor
Los Angeles, California 90067-4308
mhinks@jeffer.com
jctiensvold@jeffer.com

RAFAEL A. LLANO, ESQ.
MICHAEL J. LAURICELLA, ESQ.
ARCHER & GREINER, P.C.
1211 Avenue of the Americas, Suite 2750
New York, NY 10036-8701
rllano@archerlaw.com
mlauricella@archerlaw.com

*Attorneys for Plaintiff General Micro Systems, Inc.*

March 13, 2026

**TABLE OF CONTENTS**

**Page**

PRELIMINARY STATEMENT ..................................................................................................1

FACTUAL BACKGROUND....................................................................................................3

    I.   The Parties and the Engagement.................................................................................3

    II.  The Sale Process and Systematic Elimination of Competition...........................................4

    III. Termination and Post-Termination Conduct ...................................................................4

LEGAL STANDARD..............................................................................................................5

ARGUMENT.........................................................................................................................5

    I.   GMS Sufficiently Pled Its Claim for Breach of Fiduciary Duty. .......................................5

        A.  Defendants Owed a Fiduciary Duty to GMS.............................................................5

        B.  The Engagement Was More Than an Arms-Length Transaction. ................................7

        C.  GMS' Claim Is Not Duplicative of Its Breach of Contract Claim..............................11

    II.  Breach of Contract ...................................................................................................12

    III. Breach of the Covenant of Good Faith and Fair Dealing ..................................................15

        A.  GMS Properly Pled Its Claim. .............................................................................15

        B.  GMS' Breach of Implied Covenant Claim Is Not Duplicative...................................17

    IV. Professional Negligence............................................................................................18

        A.  GMS' Negligence Claim Is Independent of Its Breach of Contract Claim. ................19

        B.  Defendants Owed GMS a Duty of Care. ................................................................20

        C.  GMS' Claim Is Not Barred by the Engagement Letter..............................................21

        D.  The Economic Loss Rule Does Not Apply...............................................................21

    V.  Intentional Interference with Prospective Economic Advantage.......................................22

    VI. Common Law Unfair Competition ...............................................................................24

    VII.     Negligent Misrepresentation.......................................................................................25

    VIII.       Declaratory Judgment ........................................................................................27

CONCLUSION....................................................................................................................29

i

# TABLE OF AUTHORITIES

**Page(s)**

**Federal Cases**

*2002 Lawrence R. Buchalter Alaska Trust v. Philadelphia Financial Life Assur. Co.*,
  96 F. Supp. 3d 182 (S.D.N.Y. 2015)........................................................................18

*Alitalia Linee Aeree Italiane, S.p.A. v. Airline Tariff Pub. Co.*,
  580 F. Supp. 2d 285 (S.D.N.Y. 2008).....................................................................12

*In re Allianz Glob. Invs. U.S. LLC Alpha Series Litig.*,
  2021 WL 4481215 (S.D.N.Y. Sept. 30, 2021)..........................................................19

And*Velvet Underground v. Andy Warhol Found. for the Visual Arts, Inc.*,
  890 F. Supp. 2d 398 (S.D.N.Y. 2012)......................................................................28

*Ashcroft v. Iqbal*,
  556 U.S. 662 (2009)....................................................................................................5

*AT&T Corp. v. Atos IT Sols. & Servs., Inc.*,
  714 F. Supp. 3d 310 (S.D.N.Y. 2024).....................................................................24

*ATSI Comm'cns Inc.* v. *Shaar Fund, Ltd.*,
  2004 WL 616123 (S.D.N.Y. Mar. 30, 2004) ...........................................................23

*Bayerische Landesbank, New York Branch v. Aladdin Cap. Mgmt. LLC*,
  692 F.3d 42 (2d Cir. 2012)..................................................................................19, 20

*Bell Atl. Corp. v. Twombly*,
  550 U.S. 544 (2007)....................................................................................................5

*Bilinski v. Keith Haring Found., Inc.*,
  632 F. App'x 637 (2d Cir. 2015) .............................................................................14

*Boccardi Cap. Sys., Inc. v. D.E. Shaw Laminar Portfolios, L.L.C.*,
  355 F. App'x 516 (2d Cir. 2009) ...............................................................................9

*Boykin v. KeyCorp*,
  521 F.3d 202 (2d Cir. 2008).....................................................................................14

*In re Bruno Mach. Corp.*,
  435 B.R. 819 (Bankr. N.D.N.Y. 2010) ......................................................................7

*Carvel Corp. v. Noonan*,
  350 F.3d 6 (2d Cir. 2003)..........................................................................................19

*Century Pac., Inc. v. Hilton Hotels Corp.*,
   2004 WL 868211 (S.D.N.Y. Apr. 21, 2004).................................................................26, 27

*Cosmas* v. *Hassett*,
   886 F.2d 8 (2d Cir. 1988)...................................................................................................23

*Cruz v. TD Bank, N.A.*,
   855 F. Supp. 2d 157 (S.D.N.Y. 2012)...............................................................................22

*Deutsche Bank Secs., Inc.* v. *Rhodes*,
   578 F. Supp. 2d 652 (S.D.N.Y. 2008)...............................................................................20

*Ellington Credit Fund, Ltd.* v. *Select Portfolio Servicing, Inc.*,
   837 F. Supp. 2d 162 (S.D.N.Y. 2011)..................................................................................8

*Faber v. Metro. Life Ins. Co.*,
   648 F.3d 98 (2d Cir. 2011).................................................................................................5

*Fifth St. Fin. Corp. v. Toll*,
   2013 WL 3757037 (S.D.N.Y. July 17, 2013) ...................................................................23

*Golden* v. *Zwickler*,
   394 U.S. 103 (1969)...........................................................................................................28

*Hospital Auth. of Rockdale Cnty. v. GS Capital Partners V Fund, L.P.*,
   2011 WL 182066 (S.D.N.Y. Jan. 20, 2011) .....................................................................17

*Hydro Invs., Inc. v. Trafalgar Power Inc.*,
   227 F.3d 8 (2d Cir. 2000)...................................................................................................26

*In Touch Concepts, Inc. v. Cellco P'ship*,
   949 F. Supp. 2d 447 (S.D.N.Y. 2013)...............................................................................16

*JPMorgan Chase Bank, N.A. v. IDW Grp., LLC*,
   2009 WL 321222 (S.D.N.Y. Feb. 9, 2009).........................................................................9

*Lombard v. Econ. Dev. Admin. of Puerto Rico/Puerto Rico Indus. Dev. Co.*,
   2000 WL 347177 (S.D.N.Y. Mar. 31, 2000) .....................................................................23

*Maalouf* v. *Salomon Smith Barney, Inc.*,
   2003 WL 1858153 (S.D.N.Y. April 10, 2003) ...................................................................10

*Maryland Cas. Co. v. Pac. Coal & Oil Co.*,
   312 U.S. 270 (1941)...........................................................................................................28

*McBeth v. Porges*,
   171 F. Supp. 3d 216 (S.D.N.Y. 2016)...............................................................................25

iii

*Michael Grecco Productions, Inc. v. RADesign, Inc.*,
   112 F.4th 144 (2d Cir. 2024) ..............................................................................5

*Mosdos Chofetz Chaim, Inc. v. RBS Citizens, N.A.*,
   14 F. Supp. 3d 191 (S.D.N.Y. 2014)...............................................................5, 11

*Munoz-Nagel v. Guess, Inc.*,
   2013 WL 1809772 (S.D.N.Y. Apr. 30, 2013)......................................................14

*N. Shipping Funds I, LLC v. Icon Cap. Corp.*,
   921 F. Supp. 2d 94 (S.D.N.Y. 2013)...................................................................12

*Nat'l Survival Game, Inc. v. Skirmish, U.S.A., Inc.*,
   603 F. Supp. 339 (S.D.N.Y. 1985) ......................................................................20

*NM Homes One, Inc. v. JP Morgan Chase Bank, N.A.*,
   2011 WL 13267393 (S.D.N.Y. Mar. 10, 2011) ......................................................6

*Orlander v. Staples, Inc.*,
   802 F.3d 289 (2nd Cir. 2015)..............................................................................13

*Pierson v. Willets Point Contracting Corp.*,
   899 F. Supp. 1033 (E.D.N.Y. 1995) ...................................................................13

*PTCC NY, Inc.* v. *Radiation Therapy Servs., Inc.*,
   784 F. Supp. 2d 485 (S.D.N.Y. 2011).................................................................7, 9

*Purgess v. Sharrock*,
   33 F.3d 134 (2d Cir. 1994)..................................................................................22

*Recovery Racing III, LLC v. Brown*,
   2021 WL 9678666 (E.D.N.Y. Oct. 28, 2021).......................................................24

*Rexnord Holdings, Inc. v. Bidermann*,
   21 F.3d 522 (2d Cir. 1994)..................................................................................12

*Robin Bay Assocs., LLC v. Merrill Lynch & Co.*,
   2008 WL 2275902 (S.D.N.Y. June 3, 2008) ..........................................................9

*Roy Exp. Co. Establishment of Vaduz, Liechtenstein v. Columbia Broad. Sys.,*
   *Inc.*,
   672 F.2d 1095 (2d Cir. 1982)..............................................................................24

*Selevan v. N.Y. Thruway Auth.*,
   584 F.3d 82 (2d Cir. 2009)....................................................................................5

*Senior Health Ins. Co. of Pennsylvania v. Beechwood Re Ltd.*,
   345 F. Supp. 3d 515 (S.D.N.Y. 2018)............................................................10, 11

*Severstal Wheeling Inc. v. WPN Corp.*,
　809 F. Supp. 2d 245 (S.D.N.Y. 2011), *aff'd sub nom.* 659 F. App'x 28 (2d Cir.
　2016) ...........................................................................................................................20

*Sewell v. Bernardin*,
　795 F.3d 337 (2d Cir. 2015)......................................................................................5

*Shannon v. Goon*,
　2013 WL 160274 (N.D.N.Y. Jan. 15, 2013)............................................................14

*Suez Equity Invs., L.P. v. Toronto-Dominion Bank*,
　250 F.3d 87 (2d Cir. 2001)......................................................................................27

*Warren v. John Wiley & Sons, Inc.*,
　952 F. Supp. 2d 610 (S.D.N.Y. 2013).....................................................................14

*Williams v. Calderoni*,
　2012 WL 691832 (S.D.N.Y. Mar. 1, 2012) ............................................................14

*Wiseman v. ING Groep, N.V.*,
　No. 16-CV-07587 (AJN), 2017 WL 4712417 (S.D.N.Y. Sept. 28, 2017) ..............18

**State Cases**

*511 W. 232nd Owners Corp. v. Jennifer Realty Co.*,
　98 N.Y.2d 144 (2002) ...................................................................................15, 16, 17

*Access Nursing Servs.* v. *St. Consulting Grp.*,
　137 A.D.3d 678 (1st Dep't 2016) .............................................................................23

*Apple Records, Inc. v. Capitol Records, Inc.*,
　137 A.D.2d 50 (1st Dep't 1988) ................................................................................6

*Assured Guar. (UK) Ltd. v. J.P. Morgan Inv. Mgmt. Inc.*,
　80 A.D.3d 293 (1st Dep't 2010) ...............................................................................20

*Broadway Nat. Bank v. Barton-Russell Corp.*,
　585 N.Y.S.2d 933 (Sup. Ct. 1992)...............................................................11, 12, 19

*Cnty. Waste & Recycling Serv., Inc. v. Twin Bridges Waste & Recycling, LLC*,
　150 N.Y.S.3d 893 (Sup. Ct. 2021)...........................................................................24

*Dalton v. Educ. Testing Serv.*,
　87 N.Y.2d 384 (1995) ...............................................................................................16

*DKR Soundshore Oasis Holding Fund Ltd. v. Merrill Lynch Int'l*,
　80 A.D.3d 448 (1st Dep't 2011) ...............................................................................13

*Edwards v. Walsh*,
169 A.D.3d 865 (2d Dep't 2019) .............................................................7

*Frydman & Co. v. Credit Suisse First Bos. Corp.*,
272 A.D.2d 236 (1st Dep't 2000) ...........................................................9

*Kimmell v. Schaefer*,
89 N.Y.2d 257 (1996) ............................................................................27

*Krouner v. Koplovitz*,
572 N.Y.S.2d 959 (1991) .........................................................................7

*KSFB Mgmt., LLC v. Focus Fin. Partners, LLC*,
225 N.Y.S.3d 606 (Sup. Ct. 2025) ..........................................................9

*Penato v. George*,
52 A.D.2d 939 (2d Dep't 1976) ...............................................................5

*Riggs v. Palmer*,
115 N.Y. 506 (1889) ..............................................................................28

*Roni LLC v. Arfa*,
939 N.Y.S.2d 746 (2011) .........................................................................5

*Sergeants Benev. Ass'n Annuity Fund v. Renck*,
19 A.D.3d 107 (1st Dep't 2005) ..............................................................6

*Sheth v. N.Y. Life Ins. Co.*,
273 A.D.2d 72 (1st Dep't 2000) .............................................................26

**Rules**

Rule 8 ...............................................................................................14, 23, 24

Rule 9 .........................................................................................................14, 23

Rule 11 ...........................................................................................................1, 2

Rule 12(b)(6)............................................................................................1, 5, 11, 19

**PRELIMINARY STATEMENT**

Defendants Evercore Group L.L.C. and Ira Wolfson's (together "Defendants") Motion asks this Court to do what a motion to dismiss cannot: resolve disputed factual issues in Defendants' favor, credit their version of events over GMS' well-pleaded allegations, and declare Defendants the victors before GMS has had any opportunity to obtain discovery into communications and conduct that Defendants alone possess. The law does not permit this. A Rule 12(b)(6) motion tests only whether the complaint states a plausible claim for relief, not whether Defendants will ultimately prevail on the facts.

As just one example of Defendants' reliance on facts outside the Second Amended Complaint, Defendants open their Motion by insisting that the sale process collapsed because of "the erratic behavior of GMS's chief executive officer"—a factual assertion nowhere alleged in the Second Amended Complaint. (Mot. at 1.) Defendants go on to claim that Wolfson was "closely" involved in the transaction and that the Evercore team included "senior and experienced investment bankers"—matters that are contradicted by the allegations of the SAC and that can only be resolved at trial, not on the pleadings. (Mot. at 7-8.) They further argue that their communications with bidders were proper and their relationship with Veritas was adequately disclosed—again, contested facts that GMS is entitled to test through discovery.

Consistent with this approach, Defendants offer a contested account of the procedural history of this case by claiming that "GMS has amended its complaint twice, forced by two Rule 11 letters sent by Defendants raising the demonstrable misstatements in GMS's pleadings." (Mot. at 1.) This is demonstrably false. GMS engaged with Defendants' first Rule 11 letter in good faith, making modest amendments as a professional courtesy despite viewing the letter as meritless. When Defendants responded with a second Rule 11 letter, raising nearly identical arguments, GMS informed Defendants that such a motion, if filed, would itself be sanctionable under Rule 11 and

declined to further amend. That Defendants now characterize GMS as having been "forced" to amend by their Rule 11 letters is false revisionist history.

The Second Amended Complaint sets forth eight causes of action that are each grounded in specific factual allegations and supported by well-established New York law. At its core, this case is about a trusted financial advisor that betrayed its client. GMS engaged Evercore as its exclusive financial advisor for the most significant transaction in the company's history—the sale of the entire business. GMS placed complete trust in Defendants, providing them with its most sensitive business information, deferring to their purported professional expertise in the industry, and ceding to Evercore all substantive negotiation communications with prospective bidders. What GMS did not know was that Wolfson maintained a mutually beneficial financial relationship with Veritas and its Managing Partner, Hugh Evans—the very person who had recommended Wolfson to GMS in the first place.

The results speak for themselves. A sale process that began with 11 bidders offering between $530 million and $700 million ended with a single bidder, Veritas, offering just $350 million. (SAC ¶¶ 28, 37-38.) GMS alleges that this outcome was not the product of market forces or GMS' own conduct, but of Defendants' systematic efforts to eliminate competition and steer the transaction toward Veritas. GMS also alleges that Defendants made unauthorized pricing representations that discouraged competitive bidders, provided only cursory explanations for bidder withdrawals, staffed the engagement with junior advisors lacking industry experience while the senior banker who was supposed to lead the deal remained largely absent, and coordinated with Veritas to eliminate competing bids.

These are serious allegations, and GMS is entitled to its day in court to resolve them. At the motion to dismiss stage, the Court's inquiry is limited to whether GMS' factual allegations,

2

accepted as true and viewed in the light most favorable to GMS, state plausible claims for relief. They do. Defendants' invitation to resolve factual disputes in their favor, or to credit their bare assertions over GMS' pleaded allegations, should be rejected.

As demonstrated below, each claim satisfies the pleading requirements of Rule 8(a). Defendants' arguments to the contrary rely on legal standards that do not apply, factual assertions that contradict GMS' allegations, or both. The Motion should be denied in its entirety.

<u>FACTUAL BACKGROUND</u>

## I.    THE PARTIES AND THE ENGAGEMENT

General Micro Systems, Inc. ("GMS") is a California corporation and specialized manufacturer of high-performance computing systems serving critical aerospace, defense, and industrial markets. (Second Amended Complaint ("SAC") ¶¶ 3, 10.) Defendant Evercore Group L.L.C. ("Evercore") is an investment banking firm that provides financial advisory services. (*Id.*, ¶ 4.) Ira Wolfson, Evercore's Senior Managing Director, provides financial advisory services. (*Id.*, ¶ 5.)

In late 2022, when GMS began seeking a financial advisor, Hugh Evans—the Managing Partner at Veritas Capital—strongly recommended Mr. Wolfson. (*Id.*, ¶¶ 13-14.) What GMS was not told was the full nature of the Wolfson-Evans relationship:  Wolfson had served as financial advisor to Abaco Systems, a Veritas-controlled company, in connection with its believed billion-dollar sale to Ametek. (*Id.*, ¶¶ 15-17.)

Based on Evans' recommendation, GMS engaged Evercore on December 6, 2022, with the understanding that Wolfson would lead the transaction. (*Id.*, ¶¶ 19, 105.) The parties entered into an Engagement Letter, which promised comprehensive financial advisory services, including identifying buyers, coordinating due diligence, and negotiating commission terms. (*Id.*, ¶¶ 20-21.) The Engagement Letter also included a nine-month "Tail Provision" entitling Evercore to success

3

fees if GMS completed a transaction with any party Evercore contacted during the engagement. (*Id.*, ¶ 23.)

## II.    THE SALE PROCESS AND SYSTEMATIC ELIMINATION OF COMPETITION

Evercore's team, staffed largely by junior advisors with minimal aerospace and defense experience, and largely unattended by Mr. Wolfson, distributed materials to 98 potential buyers. (*Id.*, ¶¶ 26-27, 31.) Of the 50 parties that signed NDAs, 11 submitted initial offers ranging from $530 million to $700 million; Veritas' initial bid was $650-700 million. (*Id.*, ¶¶ 28, 30.) Throughout the process all substantive bidder communications passed exclusively through Evercore. (*Id.*, ¶ 34.)

By April 2025, only two bidders remained—one being Veritas. (*Id.*, ¶ 32.) Despite repeated requests, GMS received only cursory bullet points explaining bidder withdrawals, with no meaningful explanation or strategy for addressing concerns. (*Id.*, ¶ 33.)

Evercore actively discouraged bidders through unauthorized pricing representations, even going so far as to tell at least one bidder they were "not even in the ballpark" unless willing to offer $700 million. (*Id.* ¶ 40.) GMS never authorized such statements. (*Id.*)

By May 2025, with all competition eliminated, Veritas submitted a final offer of just $350 million, a $300-350 million reduction from its own initial bid. (*Id.*, ¶¶ 37-38.)

## III.    TERMINATION AND POST-TERMINATION CONDUCT

On June 27, 2025, GMS terminated Evercore for cause due to breaches of professional duties, conflicts of interest, and failure to act in GMS's best interests. (*Id.*, ¶ 49.) Rather than acknowledge their misconduct, Defendants demanded $259,185.23 in expenses—an invoice that appears artificially inflated—and threatened to enforce the Tail Provision. (*Id.*, ¶¶ 50-51, 53.) Having driven away competitive bidders, Defendants now seek to profit from their own

4

misconduct by demanding success fees if GMS transacts with any of the 98 parties Evercore contacted. (*Id.*, ¶ 52.)

## LEGAL STANDARD

On a Rule 12(b)(6) motion, the Court "draw[s] all reasonable inferences in [the plaintiff's] favor, assume[s] all well-pleaded factual allegations to be true, and determine[s] whether they plausibly give rise to an entitlement to relief." *Faber v. Metro. Life Ins. Co.*, 648 F.3d 98, 104 (2d Cir. 2011) (internal quotation marks omitted) (quoting *Selevan v. N.Y. Thruway Auth.*, 584 F.3d 82, 88 (2d Cir. 2009)); *see Ashcroft v. Iqbal*, 556 U.S. 662, 678-79 (2009). A plaintiff is entitled to relief if she alleges "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).

"Dismissal under Rule 12(b)(6) is therefore appropriate only if 'it is clear from the face of the complaint, and matters of which the court may take judicial notice, that the plaintiff's claims are barred as a matter of law.'" *Michael Grecco Productions, Inc. v. RADesign, Inc.*, 112 F.4th 144, 150 (2d Cir. 2024) (quoting *Sewell v. Bernardin*, 795 F.3d 337, 339 (2d Cir. 2015)).

## ARGUMENT

### I.    GMS SUFFICIENTLY PLED ITS CLAIM FOR BREACH OF FIDUCIARY DUTY.

#### A.    Defendants Owed a Fiduciary Duty to GMS.

A "fiduciary relationship arises between two persons when one of them is under a duty to act for or to give advice for the benefit of another upon matters within the scope of the relation." *Mosdos Chofetz Chaim, Inc. v. RBS Citizens, N.A.*, 14 F. Supp. 3d 191, 206 (S.D.N.Y. 2014) (quoting *Roni LLC v. Arfa,* 939 N.Y.S.2d 746 (2011)). The rule of fiduciary duty "embraces both technical fiduciary relations and those informal relations which exist whenever one man trusts in, and relies upon, another…" *Penato v. George*, 52 A.D.2d 939, 942 (2d Dep't 1976).

5

The factual allegations, taken as true and drawing all reasonable inferences in GMS' favor, demonstrate a fiduciary relationship independent of the Engagement Letter's obligations. (*See, e.g.,* SAC ¶¶ 24 (existence of fiduciary duties), 58 (duty to give advice for the benefit of GMS upon matters relating to the sale of GMS), 60-63 (confidence and trust, including sensitive information and substantive communications with bidders), 64 (duties of loyalty, care, disclosure, and fair dealing).) The Engagement Letter may have not contractually created a fiduciary duty, but, given the facts pled, Defendants nevertheless owed GMS a fiduciary duty outside of the terms of the parties' agreement. *See Apple Records, Inc. v. Capitol Records, Inc.*, 137 A.D.2d 50, 57 (1st Dep't 1988) ("[W]hile the contract did not establish a formal fiduciary relationship, the pleadings were sufficient to raise an issue as to the existence of an informal one."); *Sergeants Benev. Ass'n Annuity Fund v. Renck*, 19 A.D.3d 107, 110 (1st Dep't 2005) ("[L]iability for breach of a fiduciary duty 'is not dependent solely upon an agreement or contractual relation between the fiduciary and the beneficiary but results from the relation'"); *cf. NM Homes One, Inc. v. JP Morgan Chase Bank, N.A.*, 2011 WL 13267393, at *3 (S.D.N.Y. Mar. 10, 2011) ("It cannot be disputed that an investment manager of an investment account owes a fiduciary duty to its customer" that is "independent of and separate from the contract which exists between the parties").

Exemplary of GMS' extensive trust and reliance on Evercore—despite not being a formal term of the contract—is the allegation that "GMS had no direct communication with any of the bidders regarding the specific terms of their bids or the negotiation process." (SAC ¶ 34.) Rather, "*[a]ny and all substantive communication* regarding the potential deal and/or transfer of information concerning deal terms with almost all of the respective bidders *passed exclusively through Evercore.*" (*Id.* (emphasis added); *see also id.*, ¶ 62.)

6

Moreover, the express language of the Engagement Letter states that "Evercore will act as [GMS'] *exclusive financial advisor* for the purposes…set forth herein."  (ECF No. 45-1 ("EL") at 1 (emphasis added); *see also id.* ("Evercore will provide financial advisory services to" GMS); SAC ¶ 4 ("Evercore is a national investment banking firm that provides financial advisory services").) Defendants admit as much. (Mot. at 10 ("Evercore was hired to provide GMS with financial advisory services").) And as they so eloquently put, "under New York law, financial advisers are fiduciaries," which "follows from basic principles of what creates a fiduciary relationship."  (ECF No. 44-1 (citing *PTCC NY, Inc.* v. *Radiation Therapy Servs., Inc.*, 784 F. Supp. 2d 485, 505 (S.D.N.Y. 2011)).)

### B.    The Engagement Was More Than an Arms-Length Transaction.

Defendants' contention that this was an arm-length transaction contradicts the allegations of the Second Amended Complaint. GMS alleges that Defendants sat on both sides of the table, simultaneously advising GMS while maintaining a mutually beneficial financial and personal relationship with Veritas and manipulating the sales process in Veritas and Defendants' favor. (*See, e.g.*, SAC ¶¶ 44-47). Courts have found that an arm's length transaction does not exist where a party could be "viewed as sitting on both sides of the table."  *In re Bruno Mach. Corp.*, 435 B.R. 819, 835 (Bankr. N.D.N.Y. 2010). That is precisely the situation alleged here.

The SAC further alleges that Defendants' compensation was directly tied to the advice they provided to GMS and benefit they received from their relationship with Veritas (*e.g.*, SAC ¶ 64), and therefore this was not an arms length transaction involving two parties "not on close terms," as Defendants contend. Supposedly to rebut this point, Defendants highlight lawyers and real estate brokers that may have similar structures—two roles in which a fiduciary duty almost always exists. *See Krouner v. Koplovitz*, 572 N.Y.S.2d 959, 961 (1991) ("The attorney-client relationship is a fiduciary one."); *Edwards v. Walsh*, 169 A.D.3d 865, 867 (2d Dep't 2019) ("[A] real estate broker

7

is a fiduciary with a duty of loyalty and an obligation to act in the best interests of the principal")
(quotations omitted).

Even if this were an arms-length transaction, which it is not, GMS satisfactorily plead the special circumstances that would give rise to a fiduciary duty claim given Defendants' position of confidence and trust, as detailed in the paragraphs above and throughout the SAC. Defendants' other arguments to the contrary are unavailing.

First, Defendants mix and match the requirements they impose of GMS' SAC. They initially note that "there is no fiduciary duty relationship in the absence of special circumstances" (Mot. at p. 9), but later assert that "extraordinary circumstances" are required (*see id.* at pp. 10-11).

Second, allegations that the parties had a long-standing relationship are not the only way to show "extraordinary circumstances," nor does *Ellington Credit Fund, Ltd.* v. *Select Portfolio Servicing, Inc.*, on which Defendants rely, suggest as much. 837 F. Supp. 2d 162, 194-95 (S.D.N.Y. 2011) (analyzing other arguments regarding "extraordinary circumstances"); (*see* Mot. at p. 11.) Here, GMS hired Evercore based on a personal recommendation from Hugh Evans—the Managing Partner at Veritas Capital—and placed its trust and confidence in Defendants on the strength of that recommendation. (SAC ¶¶ 13-14, 19.) These circumstances are no less "extraordinary" than a long-standing relationship.

For example, this Court has found allegations similar to the SAC—that (1) the plaintiff relied on the defendant's "superior knowledge of the marketplace for financial services executives," (2) the plaintiff revealed a great deal of "highly confidential and sensitive information," including information about business plans and strategy, and (3) the plaintiff was not given access to confidential or sensitive information concerning the defendant—to be "unusual

8

circumstances evincing a higher level of trust than [is] normally present in the marketplace between those involved in arm's length business transactions." *JPMorgan Chase Bank, N.A. v. IDW Grp., LLC*, 2009 WL 321222, at \*10 (S.D.N.Y. Feb. 9, 2009) (citations and quotations omitted); *see also Frydman & Co. v. Credit Suisse First Bos. Corp.*, 272 A.D.2d 236, 237 (1st Dep't 2000) (reversing lower court and reinstating fiduciary duty claim, finding allegations that the defendant provided the plaintiff "with investment banking advice and other services, including conducting negotiations…on [the plaintiff's] behalf, in connection with the attempted acquisition, raise an issue of fact as to whether [the defendant] owed [the plaintiff] a fiduciary duty.").

Third, as discussed in Section I.A, *supra*, Defendants acted as financial advisors pursuant to the Engagement Letter, not simply as an investment bank. (*See* EL at 1 ("Evercore will act as [GMS'] exclusive financial advisor for the purposes…set forth herein."); ("Evercore will provide financial advisory services to" GMS); Mot. at 10 ("Evercore was hired to provide GMS with financial advisory services").) Moreover, none of Defendants cited authority actually address "similar circumstances," where an investment bank provided financial advisory services in connection with finding purchasers for a plaintiff's entire business. *See TPTCC NY, Inc. v. Radiation Therapy Servs., Inc.*, 784 F. Supp. 2d 485, 494 (S.D.N.Y. 2011) (locating lenders for project); *Boccardi Cap. Sys., Inc. v. D.E. Shaw Laminar Portfolios, L.L.C.*, 355 F. App'x 516, 518-19 (2d Cir. 2009) (parties originally contemplated joint takeover, and "work[ed] together to acquire control" of third business; there was "no allegation that [defendant] agreed to 'act for or to give advice for the benefit of' [plaintiff]"); *KSFB Mgmt., LLC v. Focus Fin. Partners, LLC*, 225 N.Y.S.3d 606, at \*4, \*13 (Sup. Ct. 2025) (no fiduciary duty where plaintiff was actively involved in negotiations and review of bids); *Robin Bay Assocs., LLC v. Merrill Lynch & Co.*, 2008 WL

9

2275902, at *3-4 (S.D.N.Y. June 3, 2008) (raising funds for real estate development, in which the Court's analysis broadly focused on the overlap of breach of contract and fiduciary duty claims).

As to Mr. Wolfson, "[a]ny one who knowingly participates with a fiduciary in a breach of trust is liable for the full amount of the damage caused thereby." *Senior Health Ins. Co. of Pennsylvania v. Beechwood Re Ltd.*, 345 F. Supp. 3d 515, 523–25 (S.D.N.Y. 2018) (adequately alleging defendants induced plaintiff to invest "is enough to establish that these defendants 'knowingly participate[d] in a breach of [Defendant's] fiduciary duties.'") (citations and quotations omitted). The SAC adequately alleges Mr. Wolfson's knowing participation with Evercore's breach. (*See, e.g.,* SAC ¶¶ 15-19, 45, 59, 65.) Moreover, *Maalouf* v. *Salomon Smith Barney, Inc.,* 2003 WL 1858153 (S.D.N.Y. April 10, 2003), cited by Defendants, is inapposite as it does not address fiduciary claims against individuals. *See* 2003 WL 1858153 at *1 (defining Salomon Smith Barney, Inc. as "Smith Barney"), *4-5 (discussing breach of fiduciary duty claim against Smith Barney).

Moreover, Defendants' position on fiduciary duties is irreconcilable with their broader arguments in this Motion. Defendants contend that the Engagement Letter's terms are so general and discretionary that they impose few, if any, specific contractual obligations. (Mot. at 13-14.) Yet Defendants simultaneously insist that no fiduciary duties arose from this relationship, claiming the engagement was a mere "arms-length transaction" with no "special circumstances." (*See* Mot. at 9-11.) If both propositions were accepted, GMS would have engaged Evercore to advise on the most significant transaction in its history—entrusting Defendants with its most sensitive information and ceding all bidder communications to their control—while having no meaningful recourse regardless of how Defendants performed. Such a result would render the entire

10

engagement illusory. Defendants cannot claim the benefit of contractual flexibility while disclaiming any corresponding duties of loyalty and care.

"New York courts have recognized that '[a]scertaining the existence of a fiduciary relationship inevitably requires a fact-specific inquiry,'" so "'a claim alleging the existence of a fiduciary duty usually is not subject to dismissal under Rule 12(b)(6).'" *Mosdos Chofetz Chaim, Inc. v. RBS Citizens, N.A.*, 14 F. Supp. 3d 191, 208 (S.D.N.Y. 2014). There is no reason to depart from this principle here.

### C.     GMS' Claim Is Not Duplicative of Its Breach of Contract Claim.

Defendants' contention that the fiduciary duty claim is impermissibly duplicative of the breach of contract claim is unsupported, particularly where each claim encompasses different actions and harms. *See Broadway Nat. Bank v. Barton-Russell Corp.*, 585 N.Y.S.2d 933, 945 (Sup. Ct. 1992) (fiduciary duty claim is "generally not fatally duplicative of a breach of contract claim."). GMS' breach of fiduciary duty claim alleges that Defendants affirmatively breached the duties of loyalty and care, engaged in self-dealing, misrepresentation and concealment, and sabotaging the competitive process. (SAC ¶ 65.) In contrast, its breach of contract claim alleges only that Evercore breached the Engagement Letter by "failing to conduct a proper sale process designed to maximize value for GMS" (*id.*, ¶ 73). The breach of fiduciary duty claim thus "describe[s] an independent pattern of self-enrichment and deceit" and does "not merely restate contract claims." *Senior Health Ins. Co. of Pennsylvania v. Beechwood Re Ltd.*, 345 F. Supp. 3d 515, 524 (S.D.N.Y. 2018) (declining to dismiss fiduciary duty claim as duplicative); *see also Mosdos Chofetz Chaim, Inc. v. RBS Citizens, N.A.*, 14 F. Supp. 3d 191, 207 (S.D.N.Y. 2014) ("[i]t is well settled that the same conduct which may constitute the breach of a contractual obligation may also constitute the breach of a duty arising out of the relationship created by contract but which is independent of the contract itself.").

11

Similarly, the claims do not allege the same harm. GMS' fiduciary duty claim alleges harms including "lost opportunity to achieve a higher sale price, diminished negotiating position, damage to relationships with potential buyers, and ongoing interference with GMS' ability to complete value-maximizing transactions." (SAC ¶ 68.) These go beyond those that would reasonably flow from a breach of contract by "failing to conduct a proper sale process designed to maximize value for GMS, as would 'customarily … be provided in connection with engagements of this type.'" (*Id.*, ¶ 73); *see Broadway Nat. Bank*, 585 N.Y.S.2d at 945 ("Pleading a breach of fiduciary duty is appropriate where a plaintiff, even if claiming a breach of contract, desires a remedy in tort for betrayal and breach of trust.").

Moreover, Defendants' case law is inapplicable. *See Alitalia Linee Aeree Italiane, S.p.A. v. Airline Tariff Pub. Co.*, 580 F. Supp. 2d 285, 294 (S.D.N.Y. 2008) (on summary judgment applying Virginia law, where the breach of contract claim encompassed identical facts as fiduciary duty claim); *N. Shipping Funds I, LLC v. Icon Cap. Corp.*, 921 F. Supp. 2d 94, 106 (S.D.N.Y. 2013) (claims were "identical in substance," "premised upon the same facts and seek the same damages").

Because GMS' claim is well-pled and not duplicative, the Court should deny Defendants' motion.

## II.    BREACH OF CONTRACT

GMS adequately alleges a breach of contract under New York law, which requires (1) a contract (SAC ¶ 71); (2) performance by GMS (*id.*, ¶ 74); (3) breach by Evercore (*e.g., id.*, ¶¶ 33, 42, 45-46, 73); and (4) damages (*e.g.*, *id.*, ¶ 75); *see Rexnord Holdings, Inc. v. Bidermann*, 21 F.3d 522, 525 (2d Cir. 1994). Evercore's arguments to the contrary should be rejected.

First, Evercore's contract interpretation arguments are insufficient at the pleading stage. Defendants point to the Engagement Letter's obligation that Evercore "provide financial advisory

12

services as customarily may be provided by Evercore in connection with engagements of this type." (Mot. at 13 (citing EL at 1).) The ambiguity of this obligation, however, counsels against dismissing GMS' claim, not the other way around. *Orlander v. Staples, Inc.*, 802 F.3d 289, 295 (2nd Cir. 2015) ("[I]f a contract is ambiguous as applied to [the facts that furnish the basis of the suit], a court has insufficient data to dismiss a complaint for failure to state a claim."). Evercore cannot unilaterally, on a pleadings motion, determine what services "customarily may be provided" or the parties' understanding as to what these services would entail. Nor can Defendants prove reasonableness based on the allegations in the SAC and Engagement Letter. The decision they cite on this point, *Pierson v. Willets Point Contracting Corp.*, occurred after a full bench trial, not on a motion to dismiss. *See* 899 F. Supp. 1033 (E.D.N.Y. 1995). The standard to survive a 12(b)(6) motion to dismiss is not so strict, particularly where GMS alleges significant conduct that would amount to unreasonableness, including but not limited to: failing to inform GMS as to why bidders were no longer interested (SAC ¶¶ 33, 42), failing to disclose the conflicts of interest arising from Mr. Wolfson's close relationship with Veritas (*id.*, ¶ 45), failing to contact reasonably qualified strategic buyers who would likely pay premium valuations (*id.*, ¶ 46), and providing incomplete information to potential buyers (*id.*). *See DKR Soundshore Oasis Holding Fund Ltd. v. Merrill Lynch Int'l*, 80 A.D.3d 448, 449 (1st Dep't 2011) (reasonableness "is not an issue that lends itself to determination" on a motion to dismiss).

Second, that the relevant factual information is in Evercore's sole possession—requiring GMS to plead on information and belief—is unsurprising. GMS' claims are premised largely on (1) Defendants' statements to bidders (*see, e.g.,* SAC ¶¶ 33, 35, 39-41, 46, 47) and (2) the improper relationship between Defendants and Veritas (*see, e.g., id.*, ¶¶ 15-18, 38, 43-45). Because "GMS had no direct communication with any of the bidders," and "any and all substantive communication

13

with almost all of the respective bidders passed exclusively through Evercore" (*id.*, ¶ 34)—including substantive communications with Veritas—it reasonably follows that Evercore would be in sole possession of, and would almost certainly withhold from GMS, any actionable statements. The facts are peculiarly within the knowledge, possession, and control of Evercore, and GMS' information and belief pleading is properly supported by facts upon which the belief is formed. *Boykin v. KeyCorp*, 521 F.3d 202, 215 (2d Cir. 2008); *cf. Munoz-Nagel v. Guess, Inc.*, 2013 WL 1809772, at *7 (S.D.N.Y. Apr. 30, 2013) (quoted at Mot. p. 14) (plaintiff pointed to no information forming her belief that hiring process favored younger applicants); *Williams v. Calderoni*, 2012 WL 691832, at *7 (S.D.N.Y. Mar. 1, 2012) (quoted at Mot. p. 14) (plaintiff's allegations did no more than recite elements of the claims).

Third, Evercore's assertion that GMS must publicly disclose the name of Company A, the Evercore employee who made the statement, and the time and date of the statement is not only legally unsupported, but it is incorrect. Rule 8 is not such a heightened pleading standard. (*Cf.* Mot. at p. 21 (asserting that Fed. R. Civ. P. 9's heightened standard, as opposed to Rule 8, requires a complaint to state the who, when, and where for a statement).) And Defendants' case law does not require a different result. *See Warren v. John Wiley & Sons, Inc.*, 952 F. Supp. 2d 610, 625 (S.D.N.Y. 2013) (complaint for over 270 breaches of contract did not identify the *parties to the contracts* or even "identify any contracts at all"); *Bilinski v. Keith Haring Found., Inc.*, 632 F. App'x 637, 641-42 (2d Cir. 2015) (claim for product disparagement, not breach of contract, that specifically requires the plaintiff to "name the individuals who ceased to be customers, or who refused to purchase' a product); *Shannon v. Goon*, 2013 WL 160274, at *2 (N.D.N.Y. Jan. 15, 2013) (Eighth Amendment deliberate indifference claim where "personal involvement" is a

14

prerequisite and ultimately overruling R & R to find sufficient allegation of personal involvement based on statements from hospital employees).

For the foregoing reasons, the Court should deny Defendants' Motion as to Count II.

## III.    BREACH OF THE COVENANT OF GOOD FAITH AND FAIR DEALING

### A.    GMS Properly Pled Its Claim.

In New York, "all contracts imply a covenant of good faith and fair dealing in the course of performance" that pledges that "neither party shall do anything which will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract." *511 W. 232nd Owners Corp. v. Jennifer Realty Co.*, 98 N.Y.2d 144, 153 (2002). The duties of good faith and fair dealing "encompass any promises which a reasonable person in the position of the promisee would be justified in understanding were included." *Id.* (quotations omitted).

GMS' Second Amended Complaint satisfies this standard. GMS alleges that Evercore acted in bad faith to benefit itself at GMS' expense, deliberately undermined the sale, concealed material information, staffed the transaction with inexperienced advisors, and failed to have Mr. Wolfson involved as promised. (SAC ¶¶ 80-81.) Defendants latch on to only a portion of these allegations in arguing for dismissal. Moreover, the Engagement Letter's provision that Evercore could not "guarantee the closing of the Transaction" (EL at 1) is irrelevant and does not serve as a shelter for affirmative actions taken in breach of the covenant of the good faith and fair dealing. (SAC ¶ 80 [alleging Evercore breached the implied covenant by "[a]cting in bad faith to benefit itself," "[d]eliberately undermining the sale process," and "[c]oncealing material information"].)

Defendants argue that "no reasonable person" would have understood Wolfson's representations that he would lead the sale process to be a guarantee as to his exact role or the amount of time he would devote. (Mot. at 17.) This argument fails. Mr. Wolfson was strongly recommended to act as an advisor for GMS' intended sale. (SAC ¶ 14.) Based on this

15

recommendation, GMS engaged Evercore as its exclusive financial advisor with the understanding that Wolfson would be the lead negotiator and face of the transaction. (*Id.*, ¶ 19.) A reasonable person would be justified in understanding that Mr. Wolfson's involvement would include more than responding to emails from his phone (*id.*, ¶ 82) and that the transaction team would include those with actual experience in the aerospace, defense and industrial sectors (*id.*, ¶ 81). In any event, at the "preanswer stage," the Court "need not reach the merits" of the reasonableness question. *511 W. 232nd Owners Corp.* , 98 N.Y.2d at 153 (quoted at Mot. p. 17) (finding claim sufficient by pleading they "reasonably understood the offering plan to state a duty, at the very least, to sell a sufficient number of shares in a timely manner so as to create a viable cooperative").

The Engagement Letter requires Evercore to provide "financial advisory services as customarily may be provided by Evercore." (EL at 1.) Whether Evercore met that standard is a question of fact not suited for resolution on a motion to dismiss. Moreover, "[w]here the contract contemplates the exercise of discretion, this pledge includes a promise not to act arbitrarily or irrationally in exercising that discretion." *Dalton v. Educ. Testing Serv.*, 87 N.Y.2d 384, 389 (1995). Taken as true, GMS' allegations—tied to the Engagement Letter—demonstrate Defendants' arbitrary, irrational, and bad-faith exercise of discretion. (*See, e.g.,* SAC ¶¶ 33, 35, 40-47, 80-82); *cf. In Touch Concepts, Inc. v. Cellco P'ship*, 949 F. Supp. 2d 447, 472 (S.D.N.Y. 2013) (quoted at Mot. p. 16) (plaintiff's breach of covenant claim did not include reference to the parties' engagement letter or explanation as to how they related to the engagement letter).

Further, contrary to Defendants' assertion, GMS is not imposing an "obligation to waive its right to enforce the Tail Provision" or otherwise acting inconsistently with the Engagement Letter. (*See* Mot. at 17.) Rather, GMS' allegation is grounded in Evercore's misconduct that damaged GMS' position and subsequent attempt to reap the benefits of the Engagement Letter.

16

GMS adequately pled its claim.

**B.      GMS' Breach of Implied Covenant Claim Is Not Duplicative.**

A plaintiff "may bring two breach of contact claims, one based on breach of the express terms and the other based on breach of the implied duty, as long as they are supported by factually distinct allegations." *Hospital Auth. of Rockdale Cnty. v. GS Capital Partners V Fund, L.P.*, 2011 WL 182066, at *4 (S.D.N.Y. Jan. 20, 2011) (denying motion to dismiss).

As a threshold matter, Defendants' arguments are internally inconsistent and, if accepted, would leave GMS without any remedy. Defendants argue that GMS' breach of contract claim fails because the Engagement Letter's terms are too vague to impose actionable obligations and standards—claiming the agreement "says nothing about 'maximizing value'" and only required Evercore to "provide financial advisory services as customarily may be provided." (Mot. at 13.) Yet Defendants simultaneously argue that GMS' implied covenant claim must be dismissed as "duplicative" of this same breach of contract claim. (Mot. at 15–16.) Defendants cannot have it both ways. If the contract's express terms are too vague to support a breach of contract claim at the pleading stage, then the implied covenant claim cannot be "duplicative" of a claim Defendants say does not exist because no real obligations were imposed. The implied covenant exists precisely to fill this gap—to prevent a party from "destroying or injuring the right of the other party to receive the fruits of the contract" when express terms are general or discretionary. *511 W. 232nd Owners Corp. v. Jennifer Realty Co.*, 98 N.Y.2d 144, 153 (2002). Defendants must pick a lane.

GMS properly delineates both its breach of contract and breach of good faith and fair dealing claims. Its breach of contract claim alleges that Evercore "fail[ed] to conduct a proper sale process." (SAC ¶ 73.) Conversely, GMS alleges in its good faith and fair dealing claim that Evercore breached the covenant by "[a]cting in bad faith to benefit itself and Veritas at GMS' expense," "[d]eliberately undermining the sale process," "[c]oncealing material information and

17

conflicts of interest," "[s]eeking to enforce the Tail Provision after engaging in misconduct that damaged GMS' position with alternative buyers," staffing the transaction with "advisors inexperienced in the aerospace, defense and industrial sectors," and misrepresenting the level of oversight that Mr. Wolfson would provide (a key reason GMS entered into the Engagement Letter). (SAC ¶¶ 80-81.) *See also Wiseman v. ING Groep, N.V.*, No. 16-CV-07587 (AJN), 2017 WL 4712417, at *8 (S.D.N.Y. Sept. 28, 2017) (Good faith and fair dealing claim "is not duplicative of the breach of contract claim because it plausibly alleges" the contract implied Defendants "would take certain actions even if no explicit contractual provision so stated").

Evercore flatly ignores these distinct allegations in its Motion. Moreover, the remedies sought are not identical, with GMS seeking damages for lost business opportunities, diminished market position, and other consequential damages. (*Id.* ¶ 84.)

The Court should reject Evercore's attempt to mischaracterize and delete distinct allegations and claims.

## IV.    PROFESSIONAL NEGLIGENCE

The SAC establishes that (1) Defendants owed a duty to GMS (*e.g.,* SAC ¶¶ 24, 34, 86); (2) Defendants breached that duty (*e.g., id.*, ¶¶ 39-47, 87); and (3) GMS was harmed as a proximate result of that breach (*e.g., id.*, ¶¶ 37-38, 48, 89). *2002 Lawrence R. Buchalter Alaska Trust v. Philadelphia Financial Life Assur. Co.*, 96 F.Supp.3d 182, 228 (S.D.N.Y., 2015) (for professional negligence claim, "'a plaintiff must demonstrate the elements of negligence, and that the breach of duty was by a professional in a departure from accepted standards of practice'").

This is sufficient to withstand a motion to dismiss. And contrary to Defendants' assertions, GMS' claim properly alleges a duty of care, is not duplicative of its breach of contract claim, and is not barred by the Engagement Letter or economic loss rule.

18

### A.    GMS' Negligence Claim Is Independent of Its Breach of Contract Claim.

GMS' claim is not duplicative of its breach of contract claim as it arises under a legal duty independent of the parties' contractual relationship. *See* § I, *supra*; *Broadway Nat. Bank*, 585 N.Y.S. 2d at 944 ("A duty extraneous to the contract often exists where the contract ... accompanies some relation between the parties out of which arises a duty of affirmative care.") (citation omitted).

A legal duty "may be connected with and dependent on the contract," and where an "independent tort duty is present, a plaintiff may maintain both tort and contract claims arising out of the same allegedly wrongful conduct." *Bayerische Landesbank, New York Branch v. Aladdin Cap. Mgmt. LLC*, 692 F.3d 42, 58 (2d Cir. 2012). In *Bayerische Landesbank*—a case upon which Defendants rely—the 2nd Circuit found allegations that the plaintiff relied on the defendant's representations regarding how it would select and manage a portfolio based on the contract "sufficiently established [a] legal duty independent of contractual obligations." *Id.* at 59 ("These allegations are sufficient to withstand a Fed.R.Civ.P. 12(b)(6) motion to dismiss."); *see also In re Allianz Glob. Invs. U.S. LLC Alpha Series Litig.*, 2021 WL 4481215, at *21 (S.D.N.Y. Sept. 30, 2021) (independent duty adequately pled arising out of defendant's individual representations); *Carvel Corp. v. Noonan*, 350 F.3d 6, 16 (2d Cir. 2003) (when defendant breaches contract, "that defendant may also breach an independent duty in tort if the defendant … acts in such a way that a trier of fact could infer that it willfully intended to harm the plaintiff".

As set forth in GMS' Second Amended Complaint, Defendants owed a duty of care to perform their services according to the standard of care applicable to investment bankers providing financial advisory services, arising from the relationship of confidence and trust as well as Defendants' superior knowledge and control over the sale process. (SAC ¶¶ 86-87; *see also* EL at 1 ("Evercore will provide financial advisory services as customarily may be provided by Evercore

19

in connection with engagements of this type."). GMS engaged Evercore as a direct result of a personal recommendation of Mr. Wolfson. (SAC ¶ 19.) It had no direct communication with the bidders, instead relying exclusively on Evercore for "any and all substantive communication regarding the potential deal and/or transfer of information concerning deal terms with almost all of the respective bidders." (*Id.*, ¶ 34.) These exemplary allegations establish a duty that, "though certainly 'connected with and dependent upon the contract,' would nonetheless sufficiently 'spring from circumstances extraneous to, and not constituting elements of, the contract." *Bayerische Landesbank*, 692 F.3d at 59.

### B.    Defendants Owed GMS a Duty of Care.

Defendants argue that Evercore did not owe GMS a duty of care because investment banks cannot be held liable for professional negligence. This argument is unsupported.

Evercore was not acting as an investment bank selling securities but instead as GMS' "exclusive financial advisor."  (EL at 1; SAC ¶ 19.) New York courts after *Deutsche Bank Secs., Inc.* v. *Rhodes,* 578 F.Supp.2d 652 (S.D.N.Y. 2008) (cited at Mot. p. 19) ("*DBSI*") have recognized claims of professional negligence against financial institutions. *See, e.g., Severstal Wheeling Inc. v. WPN Corp.*, 809 F.Supp.2d 245, 259 (S.D.N.Y. 2011), *aff'd sub nom.* 659 F. App'x 28 (2d Cir. 2016) (denying motion to dismiss and distinguishing *DBSI*; finding New York's Appellate Division has since recognized such claims); *Assured Guar. (UK) Ltd. v. J.P. Morgan Inv. Mgmt. Inc.*, 80 A.D.3d 293 (1st Dep't 2010), *aff'd*, 962 N.E.2d 765 (2011) ("An investment advisor may be considered a professional."). Mr. Wolfson can also be held liable under the facts pled. *Nat'l Survival Game, Inc. v. Skirmish, U.S.A., Inc.*, 603 F. Supp. 339, 341 (S.D.N.Y. 1985) ("[A] corporate officer who participates in the commission of a tort, even if he acts on behalf of the corporation and in the course of his corporate duties, may ordinarily be held individually responsible.").

20

### C.    GMS' Claim Is Not Barred by the Engagement Letter.

Defendants' argument that GMS' claim does not allege gross negligence, bad faith, or willful misconduct, and is therefore barred by the Engagement Letter, lacks merit. Notably, the Engagement Letter does not restrict the kinds of claims that may be brought, only that to be liable, the Court must also find Defendants acted with gross negligence, bad faith or willful misconduct—a fact-intensive inquiry unsuitable for resolution at this stage. In any event, the SAC is replete with allegations that Defendants acted in bad faith, including that Defendants engaged in "a pattern of bad faith and misrepresentations designed to eliminate other bidders and steer the transaction to Veritas" (SAC ¶ 39), that Defendants' "unauthorized representations and bad faith sales tactics resulted in the artificial elimination of competition" (*id.* ¶ 41), and that Defendants deliberately acted "in bad faith to benefit itself and Veritas at GMS' expense" (*id.* ¶ 80). (*See also id.*, ¶¶ 98, 99, 115.)

Nevertheless, GMS did plead allegations throughout its SAC that indicate gross negligence, bad faith, and willful misconduct, which are incorporated into its professional negligence claim. For example, GMS alleges that one way Defendants breached their professional duty was by "[f]ailing to conduct a proper competitive sale process" (SAC ¶ 87); this failure encompasses GMS' earlier allegations, *e.g.*, that "Evercore actively discouraged competitive bidders by making unauthorized pricing representations" (*id.*, ¶ 40) and that its "bad faith sales tactics resulted in the artificial elimination of competition" (*id.*, ¶ 41).

### D.    The Economic Loss Rule Does Not Apply.

GMS' claim is not barred by the economic loss rule, which at its core is effectively a rehashing of Defendants' duplicity argument. It should be noted at the outset that none of the cases cited by Defendants hold the economic loss rule *per se* bars recovery in tort when a contract is involved.

21

Moreover, Defendants grossly mischaracterize GMS' allegations. As repeatedly demonstrated in GMS' SAC as well as the sections above, Defendants owed duties to GMS and subsequently breached those duties. For example, GMS alleges that Defendants provided financial advisory services—not "investment banking services" as Defendants claim (Mot. at 20)—and that the duty arose from "Defendants' undertaking to advise GMS in a relationship of confidence and trust, Defendants' superior knowledge and control over the sale process, and the special relationship created by GMS' reliance on Defendants' expertise."  (SAC ¶ 86.)

Importantly, the damages sought by GMS are not purely economic losses that could be properly compensated. *See Cruz v. TD Bank, N.A.*, 855 F. Supp. 2d 157, 178 (S.D.N.Y. 2012) (quoted at Mot. p. 20) (The "doctrine prevents a plaintiff from recovering *purely economic losses* in a negligence action." (emphasis added)). GMS' allegations include those for "reputational harm and damage to goodwill and third-party relationships"—losses far beyond those purely economic in nature. (SAC ¶ 89 (other damages include lost higher-value sale opportunities and foreclosed alternatives, delay-related harms and increased costs of capital, out-of-pocket remediation costs to restart and re-run a competitive process with new advisors, additional vendor, diligence, and auditing expenses, and other consequential damages).)

## V. INTENTIONAL INTERFERENCE WITH PROSPECTIVE ECONOMIC ADVANTAGE

The SAC adequately alleges that (1) GMS had business relations with a third party (*e.g.,* SAC ¶¶ 27-28, 31-32), (2) Defendants interfered with those business relations (*e.g., id.*, ¶¶ 40, 91), (3) GMS used dishonest, unfair, or improper means (*e.g., id.*, ¶¶ 35, 40, 46. 92), and (4) injury to the relationship (*e.g., id.*, ¶¶ 38, 41, 48, 94-95). *Purgess v. Sharrock*, 33 F.3d 134, 141 (2d Cir. 1994).

22

GMS identified the relationships with potential buyers, primarily the 11 parties who submitted an initial non-binding offer (SAC ¶ 28), including "Company A" (*id.*, ¶ 91). Evercore—as the party who led the transaction and with whom all substantive deal discussions flowed (*id.*, ¶ 34)—is well aware of the universe of the business relationships it impacted. Further, unlike the plaintiffs in the cases cited by Defendants, GMS alleged specific, unauthorized statements that Evercore made to a potential buyer within the limited time period the GMS and Evercore were contracted. (*Id.*, ¶ 40.)

Additionally, the Court should reject Defendants' misguided attempt to invoke the heightened pleading requirements of Fed. R. Civ. P. 9(b).

None of their cited authority imposes such a requirement. *See Lombard v. Econ. Dev. Admin. of Puerto Rico/Puerto Rico Indus. Dev. Co.*, 2000 WL 347177, at *1 (S.D.N.Y. Mar. 31, 2000) (summary judgment); *Cosmas* v. *Hassett,* 886 F.2d 8, 11 (2d Cir. 1988) (not an intentional interference with prospective economic advantage claim); *ATSI Comm'cns Inc.* v. *Shaar Fund, Ltd.,* 2004 WL 616123, at n.1 (S.D.N.Y. Mar. 30, 2004) (not an intentional interference with prospective economic advantage claim); *Access Nursing Servs.* v. *St. Consulting Grp.,* 137 A.D. 3d 678, 679 (1st Dep't 2016) (state court, no discussion of Rule 9); *Fifth St. Fin. Corp. v. Toll*, 2013 WL 3757037, at *5 (S.D.N.Y. July 17, 2013) (analyzing claims under Rule 8).

GMS need only sufficiently allege "that defendants acted with the sole purpose of harming the plaintiff *or* used dishonest, unfair, or improper means." *Lombard v. Econ. Dev. Admin. of Puerto Rico/Puerto Rico Indus. Dev. Co.*, 2000 WL 347177, at *1 (S.D.N.Y. Mar. 31, 2000) (cited at Mot. 21) (emphasis added). While fraud may serve as a basis for the dishonest, unfair, or improper means, it is not the *sole* way to satisfy the element.

23

The SAC provides sufficient allegations without predicating its claim on solely a fraud theory as Defendants suggest. For example, GMS alleges that Defendants interfered by "discouraging potential buyers" and "steering the process away from competitive bidding." (SAC ¶ 92.) It also alleges that "Defendants' interference was wrongful" and "was not justified by any legitimate purpose"—not merely "fraudulent"—"but was rather motivated by Evercore's desire to benefit itself and Veritas." (*Id.*, ¶ 93.) Even excluding any reference to fraud, the SAC's allegations, taken as true, satisfy Rule 8(a)'s liberal pleading standard.

## VI.    COMMON LAW UNFAIR COMPETITION

Defendants' sole argument is grounded in a single case dealing with trademark claims. Their reading of New York common law unfair competition is too narrow, and as a result, incorrect.

Unfair competition "usually concerns the taking and use of the plaintiff's property"— "property" having been used interchangeably with "commercial advantage"—"to compete against the plaintiff's own use of the same property." *AT&T Corp. v. Atos IT Sols. & Servs., Inc.*, 714 F. Supp. 3d 310, 338 (S.D.N.Y. 2024). It is not strictly limited, as Defendants suggest, to "a showing that the 'consuming public will be confused about the source of the allegedly infringing product [or service].'" (Mot. at 23); *see also Cnty. Waste & Recycling Serv., Inc. v. Twin Bridges Waste & Recycling, LLC*, 150 N.Y.S.3d 893 (Sup. Ct. 2021) ("No showing of consumer confusion is required under a misappropriation theory of unfair competition."). Rather, an "incalculable variety of illegal practices fall[] within the unfair competition rubric"; it is a "broad and flexible doctrine" that is "adaptable and capacious." *Roy Exp. Co. Establishment of Vaduz, Liechtenstein v. Columbia Broad. Sys., Inc.*, 672 F.2d 1095, 1105 (2d Cir. 1982) (citations omitted); *see also Recovery Racing III, LLC v. Brown*, 2021 WL 9678666, at *6 (E.D.N.Y. Oct. 28, 2021) (Unfair

24

competition "proscribes all forms of commercial immorality, the confines of which are 'marked only by the conscience, justice and equity of common-law judges.'").

The SAC's allegations satisfy this broad standard. GMS alleges that Defendants "us[ed] their position of trust and access to GMS' confidential information"—*i.e.*, their "property" or "commercial advantage"—"to harm GMS' interests for Defendants' own benefit and the benefit of Veritas." (SAC ¶ 97.) Evercore effectively competed against GMS using GMS' own property; GMS sought to be sold for its maximum value at the same time Defendants unfairly eliminated competitive bidders—driving down GMS' value—for their, and Veritas', own gain. (*Id.*, ¶¶ 96-99.)

## VII.    NEGLIGENT MISREPRESENTATION

Mr. Wolfson's statements, as alleged in the SAC, are actionable.

First, the Engagement Letter's merger clause does not foreclose GMS' claim. GMS' negligent misrepresentation claim is based on statements Mr. Wolfson made to induce GMS into entering the Engagement Letter in the first place—namely, that he would be the primary negotiator and fully involved in all aspects of the sales process. (SAC ¶¶ 105-06.) These representations did not contradict any terms of the Engagement Letter; rather, they were inducements made prior to the agreement's execution. The merger clause, which applies only to "the parties" of the Engagement Letter—*i.e.*, GMS and Evercore—does not shield Mr. Wolfson from liability for his own pre-contractual misrepresentations. (*See* SAC ¶¶ 103, 105-11 [Wolfson's specialized knowledge and duty; representations that he would be the primary negotiator and fully involved; falsity, lack of reasonable grounds, intent to induce, and GMS' reasonable reliance].) Defendants' cited case is distinguishable because the relevant agreement there contained "not only standard merger clauses …, but also explicit and unambiguous non-reliance provisions." *McBeth v. Porges*,

25

171 F. Supp. 3d 216, 227 (S.D.N.Y. 2016). The Engagement Letter contains no such non-reliance provisions.

In any event, the Engagement Letter states that "Evercore will provide financial advisory services as customarily may be provided by Evercore in connection with engagements of this type." (EL at 1.) GMS could reasonably consider Mr. Wolfson's statements were captured by this clause and that Evercore would customarily have the employee responsible for obtaining the agreement, based on statements regarding his level of participation in said agreement, would actually be involved. This is a factual issue not appropriate for resolution at the pleading stage.

Second, Mr. Wolfson's statements were not puffery, opinions of value, or future expectations, as Defendants suggest. *See Sheth v. N.Y. Life Ins. Co.*, 273 A.D.2d 72, 74 (1st Dep't 2000) (not providing the actual statements made) (cited at Mot. 24). Nor are they akin to statements regarding the future, incalculable output of a yet undeveloped power plant. *See Hydro Invs., Inc. v. Trafalgar Power Inc.*, 227 F.3d 8, 12 (2d Cir. 2000) (cited at Mot. 24). Rather, the SAC's allegations—namely that Mr. Wolfson himself would be the primary negotiator and involved in all aspects of the sales process—are grounded in fact and directly tied to his own actions (or inaction). Courts have similarly denied motions to dismiss negligent misrepresentation claims alleging that defendants sought to induce plaintiffs into a business transaction by making certain statements or providing specific information with the intent that plaintiffs rely on those statements or information. *See, e.g., Century Pac., Inc. v. Hilton Hotels Corp.*, 2004 WL 868211, at *8 (S.D.N.Y. Apr. 21, 2004) (citing cases) (Plaintiffs' "allegations that defendants made numerous false statements about their plans for Red Lion with the specific intent of earning plaintiffs' trust and reliance require a denial of defendants' motion to dismiss this claim.").

26

Third, a "determination of whether a special relationship exists is highly fact-specific and generally not susceptible to resolution at the pleadings stage." *Century Pac., Inc. v. Hilton Hotels Corp.*, 2004 WL 868211, at *8 (S.D.N.Y. Apr. 21, 2004) (quotation omitted); *see also Suez Equity Invs., L.P. v. Toronto-Dominion Bank*, 250 F.3d 87, 104 (2d Cir. 2001) ("[A] determination of whether a special relationship exists is essentially a factual inquiry…"). Courts will generally consider "whether the person making the representation held or appeared to hold unique or special expertise; whether a special relationship of trust or confidence existed between the parties; and whether the speaker was aware of the use to which the information would be put and supplied it for that purpose." *Kimmell v. Schaefer*, 89 N.Y.2d 257, 264 (1996).

The SAC alleges that Mr. Wolfson "advertises himself as having 30 years of experience as a financial advisor who possesses unique, specialized knowledge in the industry"—*i.e.*, holding unique and special expertise. (*Compare* SAC ¶ 103 *with* Mot. at 24-25 (notably excluding "30 years of experience as a financial advisor who possesses")).) Further, Mr. Wolfson was aware that his statements—made directly to GMS—regarding his involvement would be used to convince GMS to enter into the Engagement Letter and provided it for this purpose. (*See* SAC ¶¶ 105, 108-109.) These are sufficient at the pleadings stage. *See Suez*, 250 F.3d at 103–04 (declining to dismiss claim where allegations that the defendants "appeared to possess—and held themselves out as possessing—special knowledge" and "knew that plaintiffs sought information" "to aid their investment decision and defendants supplied it for that purpose, while dissuading plaintiffs from conducting their own investigation").

## VIII.  DECLARATORY JUDGMENT

The Second Amended Complaint alleges that Defendants contend that the Tail Provision is enforceable, and GMS contends that it is not. (SAC ¶¶ 114-16.) Moreover, the existence and Defendants' inappropriate invocation of the tail provision actively deters GMS from seeking new

27

purchasers. (*See, e.g.,* SAC ¶¶ 52, 55.) Particularly, Evercore distributed a "teaser" letter to 98 potential buyers, 11 of which submitted an initial non-binding offer. (*Id.*, ¶¶ 26-27.) As a result, were GMS to re-engage any of these potential buyers in an effort to mitigate the harms caused by Defendants' actions, any negotiations would be made against the backdrop of the unenforceable tail provision, further affecting GMS' rights. The Amended Complaint thus alleges a "live grievance" as to whether the Tail Provision is enforceable as a matter of law, irrespective of GMS' nondisclosure of its business strategies and potential buyers. *Maryland Cas. Co. v. Pac. Coal & Oil Co.*, 312 U.S. 270, 273 (1941) (requiring "a substantial controversy, between parties having adverse legal interests, of sufficient immediacy and reality…".).

Defendants' reliance on *Golden* v. *Zwickler,* 394 U.S. 103, 109 (1969), relating to election campaigning in which the alleged prospect was "wholly conjectural," is inapposite. And*Velvet Underground v. Andy Warhol Found. for the Visual Arts, Inc.*, 890 F. Supp. 2d 398, 404-407 (S.D.N.Y. 2012) is distinguishable because the defendant there furnished a sweeping covenant not to sue for any copyright infringement by plaintiff. *See* 890 F. Supp. 2d at 404-07. Unless and until Defendants waive the tail provision, a live controversy exists.

Further, Defendants misconstrue the SAC's allegations. GMS does not allege that the tail provision, read in a vacuum, is unenforceable. Instead, "*enforcement* of the Tail provision"— effectively rewarding Defendants—in view of their extensive misconduct would be unconscionable and contrary to public policy. (SAC ¶¶ 116); *see Riggs v. Palmer*, 115 N.Y. 506, 511–12, (1889) ("No one shall be permitted to profit by his own fraud, or to take advantage of his own wrong…").

28

## CONCLUSION

For the foregoing reasons, the Court should deny Defendants' Motion to Dismiss in its entirety.

BY: */s/ Matthew D. Hinks*
MATTHEW D. HINKS (Pro Hac Vice)
JULIA CONSOLI-TIENSVOLD (Pro Hac Vice)
JEFFER MANGELS & MITCHELL LLP
1900 Avenue of the Stars, 7th Floor
Los Angeles, California 90067-4308
mhinks@jeffer.com
jctiensvold@jeffer.com

BY: */s/ Rafael A. Llano*
RAFAEL A. LLANO, ESQ.
MICHAEL J. LAURICELLA, ESQ.
ARCHER & GREINER, P.C.
1211 Avenue of the Americas, Suite 2750
New York, NY 10036-8701
rllano@archerlaw.com
mlauricella@archerlaw.com

*Attorneys for Plaintiff General Micro Systems, Inc.*

DATED: March 13, 2026

29

**CERTIFICATE OF COMPLIANCE**

I, Julia Consoli-Tiensvold, an attorney duly admitted to practice before this Court, hereby certify pursuant to Local Rule 7.1(c) and Rule 4(B) of this Court's Individual Rules of Practices in Civil Cases that the foregoing Opposition Memorandum of Law was prepared using Microsoft Word and contains 8,741 words.

Dated:   March 13, 2026                             BY:  */s/      Julia Consoli-Tiensvold*
                                                              Julia Consoli-Tiensvold